1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                        FOR THE DISTRICT OF OREGON

10

11   KRISTINA J. SWILLEY,            )
                                     )      No. CV 08-24-HU
12                  Plaintiff,       )
                                     )
13         v.                        )
                                     )      OPINION AND ORDER
14   MICHAEL J. ASTRUE,              )
     Commissioner, Social           )
15   Security Administration,        )
                                     )
16                  Defendant.       )
     _____)

17

18   David B. Lowry
     9900 S.W. Greenburg Road
     Columbia Business Center, Suite 235
19   Portland, Oregon 97223
            Attorney for plaintiff
20

21   Karin J. Immergut
     United States Attorney
     District of Oregon
22   Britannia Hobbs
     Assistant United States Attorney
23   1000 S.W. Third Avenue, Suite 600
     Portland, Oregon 97204
24   David Morado
     Regional Chief Counsel
25   Leisa A. Wolf
     Special Assistant United States Attorney
26   Office of the General Counsel
     Social Security Administration

27

28   OPINION AND ORDER Page 1

701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104
          Attorneys for defendant

HUBEL, Magistrate Judge:

     Kristina Swilley brings this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying her application for Supplemental Security Income benefits under Title XVI of the Social Security Act.

### Procedural Background

     Ms. Swilley filed protectively an application for benefits in November 2002, alleging disability since April 7, 1998, as a result of scoliosis and a learning disorder and/or organic brain injury. Her application was denied initially and on reconsideration. Ms. Swilley had a hearing before Administrative Law Judge (ALJ) Jean Kingrey on August 15, 2006. On October 25, 2006, the ALJ issued an unfavorable decision. The ALJ's decision became the final decision of the Commissioner on November 2, 2007, when the Appeals Council denied review.

     Ms. Swilley was born in 1988, and was 18 years old at the time of the ALJ's decision. She has less than a high school education, and no past relevant work.

### Medical Evidence

     On May 9, 2001, when she was 13 years old, Ms. Swilley was seen at Shriners Hospitals for Children for scoliosis. A report signed by Ivan Krajbich, M.D. and Matthew Halsey, M.D. states that

OPINION AND ORDER Page 2

she had a history of scoliosis noted by her stepmother approximately two years previously, but she had not received any particular treatment. Tr. 286. Ms. Swilley complained of pain every day, but was unable to identify a particular area in either the cervicothoracic or lumbar spine. She did not take any medication for the pain, and was very active, playing volleyball and other sports at school. Id.

X-rays demonstrated scoliotic deformity, with a curve at T1-5 measuring 37 degrees and a curve at T5-10 measuring 25 degrees. Tr. 288. She was also noted to have a mild abnormality at the L5-S1 junction on the left side, but it was not clear whether this was a spondylolytic defect or a congenital abnormality. Id. Physical therapy was recommended, and she was to follow up in four months with Dr. Krajbich. Id. However, she did not return until two years later.

On June 12, 2003, Ms. Swilley returned to Shriners Hospital and was seen by Charles d'Amato, M.D. Tr. 283. Dr. d'Amato noted that the curve at T1-5 had progressed from 37 degrees to over 50 degrees. Id. Ms. Swilley complained of pain around her rib cage and back, and over her hips. Id. She denied night pain or headaches. Dr. d'Amato discussed spinal fusion surgery in detail, including risks associated with the surgery and an explanation that the spine would not be completely straightened and the back contours would not be completely normal. Id.

On July 30, 2003, Ms. Swilley underwent posterior fusion from T2 to L1. Tr. 298. On August 5, 2003, a chart note stated that her

OPINION AND ORDER Page 3

postoperative course in the hospital was unremarkable and she progressed well. Tr. 292. X-rays taken on August 8, 2003, showed dextroscoliosis from T5 to T11 measuring 28 degrees, compared to a pre-operative 57 degrees, and 38 degrees on the left, compared to 37 degrees on the pre-operative films. Tr. 296.

On August 6, 2003, reviewing physician Sharon Eder, M.D., and reviewing psychologist Robert Henry, Ph.D., completed a Childhood Disability Evaluation Form for Ms. Swilley. Tr. 303-308. Doctors Eder and Henry concluded that Ms. Swilley's impairments of scoliosis and learning disability did not meet or equal any listing, and that they were not functionally equivalent to any listing. In the domain of acquiring and using information, her limitations were found "less than marked," tr. 305; no limitations were found with respect to attending and completing tasks or interacting with others. Tr. 306. In the domains of moving about and manipulating objects, and of health and physical well-being, her limitations were rated "less than marked;" and in the domain of caring for herself, no limitations were found. Tr. 306. The basis for these findings was that even before the fusion surgery, Ms. Swilley was able to function and ambulate in a normal or regular classroom, and that although teacher questionnaires indicated that she exhibited some difficulty in reading and writing, comprehending instructions, expressing ideas, and completing assignments on time, she had been placed in a regular classroom setting and had no noted difficulty interacting with others or caring for her needs. Tr. 305-306.

OPINION AND ORDER Page 4

On September 6, 2003, Ms. Swilley was seen by Nick Hartnell, M.D., and Michael Aiona, M.D., for a six week surgical followup. Tr. 293. An x-ray taken on September 10, 2003, showed her thoracic dextroscoliosis reduced to 14 degrees, and excellent alignment of the spine. Tr. 294. She reported feeling progress, and had no issues with pain or analgesia. Tr. 293. There was some numbness around the scar near the chest, but the scar was well healed. Id. Ms. Swilley was told she should not lift or bend, and to follow up in three months. Id.

On December 6, 2003, Ms. Swilley was seen by Catherine Humphrey, M.D., in Medford. Tr. 329. Dr. Humphrey wrote, "Mom has multiple complaints today," including significant pain around the left shoulder, which had "occurred primarily with her going back to school full time." Id. Dr. Humphrey wrote that Ms. Swilley's mother also reported a patch of numbness over the right side of Ms. Swilley's back and that she felt "like her scar is moving." Id. Dr. Humphrey noted that the scar was well healed, and that Ms. Swilley did have markedly diminished light touch sensation from the level of about T12 to the tip of her shoulder blade. Id. The left shoulder had some palpable spasm in the trapezius and the levator. Id. X-rays showed hardware in good position and stable thoracic curve. Id., tr. 330. Dr. Humphrey concluded,

> Mom is adamant today that Kristina is not capable of being back in school full time and given her persistent symptoms of shoulder pain that her hours should be reduced. She does not feel she has had ideal communication with Dr. d'Amato, and perhaps the best follow up for her would be to be seen by Dr. d'Amato up in Portland.

OPINION AND ORDER Page 5

Id. An x-ray taken on December 6, 2003 showed mild persistent thoracic dextroscoliosis, unchanged since September 2003, and spondylolysis of L5 with minimal grade I spondylolisthesis of L5 in relation to S1, but no other misalignment. Tr. 332.[1]

On December 9, 2003, Martin Kehrli, M.D., an internist, and Peter LeBray, Ph.D., a psychologist, reviewed Ms. Swilley's records and completed an assessment of functioning through the sequential evaluation provided by Social Security regulations. Tr. 309. Their conclusion was that Ms. Swilley's impairment or combination of impairments was severe, but did not meet, medically equal, or functionally equal the listings. Id. In the domain of acquiring and using information, and attending and completing tasks, Ms. Swilley's impairments were found to be "less than marked," with a note that she lacked "motivation and organization, per teacher q[uestionnaire] 10/03." Tr. 311. They assessed her as having no limitations in interacting and relating with others, caring for herself, and health and physical well being. Tr. 311-12. She was found to have marked limitation in her ability to move about and

---

[1] According to a website maintained by the American Academy of Orthopedic Surgeons, spondylolysis is a stress fracture in one of the vertebrae, usually L5, and is a common cause of back pain in adolescents. Treatment is initially nonsurgical and includes anti-inflammatories, a back brace, and stretching/strengthening exercises for the back and abdominal muscles. See http://orthoinfo.aaos.org/topic.cton?topic=A00053. Another website defines spondylolysis as "[t]he breaking down (dissolution) of a portion of a bony building block of the spine (vertebra). The portion of the vertebra that is affected ... is ... the pars interarticularis." http://www.emedicinehealth.com/script/main/art.asp?articlekey=7206.

OPINION AND ORDER Page 6

manipulate objects, but the limitation was expected to be "less than marked" by July 2004. Tr. 312. Doctors Kehrli and LeBray explained their findings:

> The claimant is 15 years of age and her mother contends she is unable to function like a normal 15 year old due to scoliosis. She reports her daughter underwent spinal fusion in July and that she has a learning disability.
>
> Records confirm T2-L1 fusion 7/03, f/7 9/03 she is in excellent alignment with no motor or sensory deficits. No lifting or bending until fusion is solid. No problems with pain. Info from the school confirms the claimant has received tutoring services due to her surgery. She is working toward IEP goals but does not do any work unless the tutor is present. Problems with attention and task persistence are seen as motivational and no sense of responsibility. There are no problems in other areas. Special ed teacher indicates claimant has problems with written expression, reading, and math. Reading and writing skills are at the 5th grade level, math not recently assessed. A variety of options to have the claimant attend school and provide for physical safety while her fusion progresses were recently discussed, but her parent essentially refused them all.
>
> There is no evidence that the claimant had significant impairment of motor function prior to her surgery 7/03. She appears to be progressing well, although fusion is not yet solid. Even with giving her the benefit of doubt, she would only have restriction of motor function from 7/03, and certainly should attain full fusion by 7/04. She clearly would not have duration due to her back surgery even if the current level of impairment is considered to be marked. She has less than marked limitations in acquiring and using information based on her learning disability, and that limitation has been present throughout. Lack of attention and task persistence are not attributed to a medically determinable impairment and is therefore not severe. An appropriate projection for improvement in this case would have been and remains 7/04 rather than 11/03.

Tr. 314.

On March 18, 2004, Ms. Swilley saw Dr. d'Amato. Tr. 327. Dr. d'Amato noted that she had been followed in the Medford Outreach

OPINION AND ORDER Page 7

Clinic, but there "seems to be a good bit of anxiety and concern today on the part of the parents because of a patch of numbness that is still present on the skin in the incisional area." Id. Ms. Swilley's parents were also concerned about her riding on the usual school bus because of the rowdiness of the other students, but Dr. d'Amato wrote that Ms. Swilley "seems fairly comfortable and is anxious to get back to more activities." Id. Dr. d'Amato noted that x-rays showed no change, with the right thoracic curve corrected from 59 degrees to 10 degrees and the left thoracic curve corrected from 35 degrees to approximately 18 degrees. Id. Ms. Swilley reported some shoulder pain. Id. Dr. d'Amato told the Swilleys the numbness might be permanent, but he did not think it was from costal nerve root injury. Id. He thought the shoulder pain was "very common in adolescents her age and could even be present had she not had the scoliosis surgery and may be in some extent [sic] related to her activity." Id. Dr. d'Amato recommended moist heat and stretching exercises to be done before and after sporting activities. Id. Dr. d'Amato wrote, "I would allow her to swim, bicycle and jog, but she should start this very gradually. She should not do any diving or horseback riding yet." Id.

On September 16, 2004, Ms. Swilley was seen by Doctor d'Amato and Mark Hurworth, M.D. Tr. 326. She complained only of intermittent pain over her right thoracic cage where she had a thoracoplasty. Id. This prevented her "from doing too much in terms of lifting and carrying." Id. X-rays showed "no evidence of anything untoward," with good correction of the scoliosis. Id. Dr.

OPINION AND ORDER Page 8

d'Amato advised her to start some upper body exercises with light weights and to continue with her swimming program. Id.

A chart note for March 8, 2005 by John Lee, M.D., noted that Ms. Swilley was complaining of lower back pain with forward flexion and lateral bending toward the right side. Tr. 322. Dr. Lee noted that x-rays had showed spondylolysis at the L5 vertebra. Id.; tr. 324-25. On March 9, 2005, Ms. Swilley saw David J. Abdun-Nur, M.D., to request muscle relaxants and a note for school prescribing 20 to 40 minutes of rest at a time of her choosing. Tr. 335. Ms. Swilley said naproxyn helped her back, but she did not want to take it because of recent publicity about heart problems. Id. Dr. Abdun-Nur told Ms. Swilley and her mother that if naproxyn worked for her, she should use it, and at Ms. Swilley's age she should not be worried about heart problems. Id. Dr. Abdun-Nur informed them he would not prescribe medication without notes from Shriners Hospital to see what they recommended. Id. The next day, Dr. Abdun-Nur contacted Ms. Swilley's mother to say that he had reviewed the notes from Shriners, and that he was not comfortable prescribing pain medications for Ms. Swilley because it could be dangerous to mask her pain without knowing what was wrong. Tr. 334. According to the chart note, Ms. Swilley's mother became very upset and said she "would be changing [doctors] to someone who cares." Id.

On March 17, 2005, Ms. Swilley saw Moshe-Gad Bialik, M.D., and Dr. d'Amato with complaints of pain for the past two months. Tr. 319. She described the pain as constant and located in her low back, but without radiation. Id. It was decided to do a CT scan of

OPINION AND ORDER Page 9

the lower lumbar spine to assess a traumatic spondylolysis, and meanwhile for her to wear a brace during the day and do stretching exercises. Tr. 320. Ms. Swilley was to return in two months and, "[i]n the meantime, she will be excused from physical education lessons." Id.

On May 5, 2005, Ms. Swilley was seen at Wellspring Family Practice to establish care. Tr. 337. A nurse practitioner, Brandee Danks, wrote that Ms. Swilley's mother told her that six months after surgery, it was discovered that her daughter had an L5 fracture. Id. This was presumably a reference to spondylolysis. Ms. Danks noted that Ms. Swilley's mother was "under the impression that she can expect to fracture very easily and develop osteoporosis at a very young age." Id. Ms. Swilley's parents stated that they would not allow Ms. Swilley to take naproxyn, despite assurances that naproxyn was safe for her. Tr. 338.

A CT study of the lumbar spine done on May 11, 2005, showed only mild thoracic and lumbar scoliosis, in the range of five degrees. Tr. 345.

On May 19, 2005, Ms. Swilley was seen by Dr. d'Amato in Portland. Tr. 317. Dr. d'Amato noted that she had been given a brace approximately six weeks earlier, which seemed to have "helped her pain a lot and has nearly completely eliminated it." Id. He wrote that Ms. Swilley had "no other complaints relative to her spine or anything else today." Id. Physical examination showed her spine to be "quite flexible," with "excellent correction of the scoliosis." Id. The CT scan showed a "fairly sclerotic-looking

chronic spondylolysis," but "very minimal anterolisthesis, perhaps 2 mm or so, if that." Id. Dr. d'Amato concluded that Ms. Swilley could begin "weaning herself from the brace," but that she should recognize that "this pain may come and go with time." Id. He observed that there was no other treatment except exercises, intermittent bracing, and surgery "if these things fail, and that should be avoided, if possible." Id. She was told to resume gradually normal activities after stretching and confine her medication use to non-steroidal anti-inflammatory drugs (NSAIDs).

On August 18, 2005, Ms. Swilley was seen at the Medford Neurological and Spine Clinic by David Walker, M.D. Tr. 341. Ms. Swilley reported that since her surgery, she had "begun developing multiple problems," including severe mid-thoracic back pain, low back pain on the right side which made her unable to stand for prolonged periods of time, and numbness extending from approximately T12 dermatome on the right to approximately T4. Id. Ms. Swilley's mother reported that she had been unable to get any sort of prognosis on her daughter's future work or activity requirements, and said she believed Ms. Swilley's pain made her unable to perform adequately at school, for which she had sought disability benefits. Id. According to Ms. Swilley's mother, she had not received any assistance from the operating surgeon. Id. Dr. Walker diagnosed sacroiliac (SI) joint dysfunction and facet arthropathy with back pain, and referred her for facet and SI joint injections. Tr. 343.

///

OPINION AND ORDER Page 11

1    A spinal x-ray taken on August 22, 2005, revealed "marked
2    improvement of the scoliosis," with only minimal, subclinical
3    curvature, when compared to films dated January 2, 2003. Tr. 344.
4    On October 13, 2005, Ms. Swilley saw Joseph Savino, M.D., at
5    Pain Care of Oregon, for SI joint injections. Tr. 352. Dr. Savino
6    wrote that previous therapies had included physical therapy and a
7    TENS unit. Id. Dr. Savino noted that a CT scan of the lumbar spine
8    done on May 11, 2005, showed bilateral pars interarticularis defect
9    involving L5,[2] associated with minor anterolisthesis of an
10   estimated 2 mm at the L5-S1 level, along with mild thoracic and
11   lumbar scoliosis. Id. After a discussion with Ms. Swilley and her
12   mother, Dr. Savino agreed to proceed with bilateral SI joint
13   injections. Tr. 353. The SI joint injections were performed on
14   October 19, 2005. Tr. 350-51.
15   On October 21, 2005, Ms. Swilley returned to Shriners Hospital
16   to see Dr. d'Amato. Tr. 367. Dr. d'Amato wrote that repeat x-rays
17   of the spine were done, which showed her scoliosis instrumentation
18   and fusion were intact, with no progression of her spondylolysis.
19   Id. Dr. d'Amato explained to Ms. Swilley's mother that injections
20   in the facet joints were not likely to help the spondylolysis,
21   since the facet joints were not likely to be the source of the
22   pain, and the benefits of joint injections were "rather
23   questionable, in my opinion." Id. Dr. d'Amato also advised against
24   injections because of the risk of contaminating the spinal
25
26   _____
27       [2] Pars interarticularis defect is another term for
     spondylosis. See http://www.medcyclopedia.com
28   OPINION AND ORDER Page 12

1 hardware. Id.

2     Dr. d'Amato advised that the proper treatment for her lower
3 spine would be to use a brace, do back flexion exercises, and take
4 anti-inflammatory medications. Id. He instructed Ms. Swilley in the
5 exercises and arranged for the brace and the physical therapy. Id.
6 Dr. d'Amato thought that if Ms. Swilley were compliant, it was
7 "likely that she will improve." Id. However, if she did not
8 improve, he would entertain the option of additional surgery. Id.

9     On October 26, 2005, Ms. Swilley returned to Dr. Savino,
10 reporting that the SI joint injections "did not help her at all."
11 Tr. 348. Dr. Savino explained that one benefit of the injections
12 was that "we can now exclude that as being her pain generator." Id.
13 Dr. Savino performed diagnostic medial branch blocks of the lumbar
14 facet joints bilaterally at L4 and L5. Id.

15     In a progress note dated December 6, 2005, Dr. Savino wrote
16 that Ms. Swilley's response to the medial branch blocks was
17 "equivocal," and that he thought it was "questionable as to whether
18 or not the facet joints are even the source of her pain." Tr. 346-
19 47.

20     On June 16 and 20, 2006, Ms. Swilley was given a comprehensive
21 psychodiagnostic examination by Grant Rawlins, Ph.D. Tr. 370. When
22 asked about what interfered with her ability to work, Ms. Swilley
23 answered, "I can't sit or stand very long. I have a low reading
24 level." Id. She could she could sit or stand for half an hour to an
25 hour before having to stand up and stretch, and is unable to lift
26 more than 15 pounds. Id. Ms. Swilley said she was dyslexic, reading

27

28 OPINION AND ORDER Page 13

at sixth grade level because "the letters flip around." Id.

She reported that her current medication was Flexeril, which she uses only about once a month. Tr. 371.

Dr. Rawlins observed that Ms. Swilley's spotty memory of her childhood before the age of 10 usually "indicates dissociative defenses developed to deal with overwhelming childhood stress," tr. 372, and noted that Ms. Swilley reported childhood sexual abuse from a stepfather and that her mother drank heavily, married numerous times, and had lost custody of her when Ms. Swilley was 10 years old. Tr. 371. Ms. Swilley reported symptoms indicative of post-traumatic stress disorder (PTSD), including intrusive thoughts of abuse, trauma-related nightmares about 10 times a month, avoiding TV shows and movies that might trigger her memories, fear of being close to men, hypervigilance and exaggerated startle response. Tr. 373. Ms. Swilley also reported feeling depressed several times a week, about not being able to do things others her age could do and being uncomfortable in public. Id. She also described sleep disturbance, saying she averaged four hours of sleep a night, being up and down all night because of pain. Id. She also described low self esteem, low energy level, difficulty concentrating, and social withdrawal. Id.

Testing indicated that her short term memory was adequate, her general fund of knowledge was poor, her calculation ability was somewhat impaired, her concentration and attention were adquate, her eye-hand coordination was adequate, but she was not able to perform serial 7s and her abstract thinking ability was poor. Tr.

OPINION AND ORDER Page 14

374. She is able to shop, has a driver's permit, and is able to use public transportation. She maintains her own hygiene and grooming. Tr. 375. Her social life was somewhat limited: she saw family members and had two friends. Id. Her judgment was adequate. Id. on the Wechsler Memory Scale III, there was substantial subtest scatter, which Dr. Rawlins thought indicated the probability of organic brain dysfunction. Her visual and auditory memory scores were in the retarded range. Id. Academic testing showed Ms. Swilley's basic abilities at the level of a middle grade school child: reading at fourth grade level, spelling at third grade level, and arithmetic at fifth grade level. Tr. 376. However, oral language abilities were well above her other educational skills. Id. Dr. Rawlins also thought Ms. Swilley had symptoms meeting the criteria for Dysthymic Disorder, including insomnia, low energy, low self esteem, poor concentration, feelings of hopelessness, and mild suicidal ideation. Id. In addition, he thought she exhibited symptoms of mild to moderate PTSD related to an abusive childhood and significant dissociative symptoms, also related to childhood abuse. Id. Dr. Rawlins wrote, "Although no medical information was available for my review, it appears probabl[e] that Kristina suffers from a Somatoform Disorder, probably '[p]ain [d]isorder associated with both psychological factors and her general medical condition.' ... If medical findings do not support the degree of pain and limitation of which Kristina complains, the impression of a Somatoform Disorder would be strengthened." Id.

///

OPINION AND ORDER Page 15

Dr. Rawlins concluded that Ms. Swilley had marked limitations in activities of daily living, social functioning, and concentration, persistence and pace. Tr. 377.

### Educational Evidence

On September 23, 2002, when Ms. Swilley was in eighth grade, she received educational testing. Tr. 124. The results indicated that her oral language skills were average; her oral expression skills were low average; her listening comprehension skills were average. Id. However, her academic skills and fluency with academic tasks were in the very low range, her ability to apply academic skills, and her level of academic knowledge was low average. Id. In math calculation skills and written expression, her performance was low average, reading comprehension, math reasoning, and basic writing skills were low, and her basic reading skills were very low. Id. Her report card showed that she was working at eighth grade level in American History, science, language arts, and pre-algebra, but below grade level in reading. Tr. 113.

A teacher questionnaire dated October 25, 2003, indicated that Ms. Swilley had a "serious problem" in reading and comprehending written material, an obvious problem with expressing ideas in written form, learning new material, and recalling and applying previously learned material; and a slight problem in comprehending oral instructions, understanding school and content vocabulary, and understanding and participating in class discussions. Tr. 163. The teacher wrote:

> The student is not independent. While on home tutoring she did very little work. Only worked when tutor was

OPINION AND ORDER Page 16

actually present. Had to have direct support to find info in text to answer questions. It seemed to be a motivational issue according to the tutor.

Id. Although the teacher rated Ms. Swilley as having problems with organizing school materials, completing homework assignments, completing work accurately without careless mistakes, and working at a reasonable pace, the teacher noted, "My experience with this student tells me that the problem in this area is a lack of motivation and responsibility." Tr. 164. The teacher concluded,

> My personal experience w/ Kristina is limited due to her not being in school for the first part of the year. My experience w/ her indicates to me that she does have a learning disability in the qualifying areas of written expression, reading comprehension, basic reading skills, and math calculation. It is my opinion as a special educator that along with Kristina's disability, she is unmotivated and needs to be more independent in completing work.

Tr. 169.

On February 25, 2004, two of Ms. Swilley's teachers provided written input for an IEP meeting. Tr. 236-237. Her keyboarding teacher wrote that Ms. Swilley was completing most assignments with good techniques, and that she was "typing by touch" and "doing fine." Tr. 236. Her performance was above average in comparison to her peers. Id. Her teacher for English Essentials wrote that Ms. Swilley was "almost passing" English, but that reading and writing skills improvement was needed. Tr. 237. The teacher noted that Ms. Swilley was "off track at times," and needed to turn in her work once it was completed; further, she was "highly social" during class. Id.

///

OPINION AND ORDER Page 17

Three of Ms. Swilley's teachers at North Valley High School completed School Activities Questionnaires on August 30, 2005. Tr. 242-44.

Her photography teacher wrote that Ms. Swilley had low attention span and concentration, but that she had good on-task behavior in groups. Tr. 242. Her ability to work independently was low except in group activities. Id. Attendance problems were noted, but not behavior concerns or difficulty getting along with peers and teachers. Id. Her fine and gross motor skills "appeared good," and she was characterized as "quiet," although she "did talk with peers." Id.

Her math teacher, Martin Connelly, reported that Ms. Swilley was currently mainstreamed in a pre-algebra class, and that her attention span, concentration, and on-task behavior were good. Tr. 243. He rated her ability to work independently as average. Id. However, he noted that she had "very weak attendance," and that she "rarely completes assignments." Id. She responded well to changes of routine, and got along with peers and teachers in the classroom. Mr. Connelly found "no apparent problems" with her fine and gross motor skills, and reported that he had "not seen any particular difficulty" with respect to expressive and receptive language communication skills. Id.

Ms. Swilley's science teacher, Leslie Clark, wrote that Ms. Swilley's attention span, concentration, and on-task behavior in class were "OK when here." Tr. 244. Ms. Clark thought she was able to work independently of teacher supervision, but noted that "lack

OPINION AND ORDER Page 18

of attendance is a big problem as well as tardiness, and she rarely completes work even when here."' Id. Ms. Clark noted that Ms. Swilley was OK socially," and did not differ from her peers in behavior. Id. Her fine and gross motor skills were both normal, and her communication skills were at grade level. Id.

On September 14, 2005, Ms. Swilley's educational testing indicated that her oral language skills were average, her academic skills, fluency with academic tasks, and ability to apply academic skills were within the very low range, reading comprehension and math reasoning were low average, basic reading skills, math calculation and written expression were low, and her basic writing skills were very low. Tr. 263.

At an Individual Education Plan (IEP) meeting on October 11, 2005, Ms. Swilley indicated that she was interested in cooking and art, including drawing and painting, but was "not interested in taking classes here." Tr. 257. Her teachers indicated that Ms. Swilley had problems with attendance, turning in assignments, and completing assignments. Tr. 258.

Ms. Swilley's services summary for North Valley High School dated March 4, 2007, indicates that she was in a regular 11th grade class for math, and in both regular education and resource rooms for reading and writing. Tr. 245. As accommodations, she was given extra time for class completion, preferential seating, permission to stand to relieve back pain, access to a resource room, permission to use a calculator, and access to editing assistance and a reader. Tr. 248.

OPINION AND ORDER Page 19

### Hearing Testimony

At the hearing, Ms. Swilley testified that she had been caring for her great grandmother at her grandmother's house, but that she planned to go back to high school and graduate. Tr. 404, 406. She said she was in regular math classes, but special education reading classes. Tr. 405.

Ms. Swilley said her upper back felt as though "it's curving again." Tr. 407. She said she tries not to sit more than half an hour at a time because she "gets discomfort," tr. 408, but that such a limitation had not been imposed by her doctors. Tr. 409. She said the only limitation her physician had imposed was not carrying more than 15 pounds. Id. Ms. Swilley said her doctors had not restricted her walking, but that she did not walk more than two or three blocks at a time without sitting down because "I will get discomfortable." Tr. 410. She said she is able to stand for about half an hour before her lower back and hip began hurting. Id. She only sleeps two or three hours at night because she cannot get comfortable, and makes up for a lack of sleep at night by napping about three times a day for 20 to 30 minutes at a time. Tr. 410-11. She is accommodated at school by having two sets of books so that she is not required to carry books home, and by being permitted to stand up in class and leave class to lie down. Tr. 411-12. However, Ms. Swilley said leaving class to lie down "doesn't happen very often," and that she tries to "stay in class." Tr. 412. Ms. Swilley said she leaves class to lie down once or twice a week for about half an hour. Id.

OPINION AND ORDER Page 20

At home, she prepares meals for herself and her grandmother, and does laundry except for putting wet clothes in the dryer, because it is hard for her to bend and the wet clothes are too heavy for her. Tr. 413. She occasionally shops for groceries. <u>Id.</u>

Ms. Swilley stated that she took a keyboarding class at school but had difficulty doing it because her arms would go numb and she couldn't move them. Tr. 414. She does not take PE. <u>Id.</u> She swims, however. Tr. 418.

The ALJ called a vocational expert (VE), Frances Summers. <u>Id</u>. The ALJ asked the VE to consider an individual 18 years old, with a limited education and physically capable of light work except for a 15 pound weight limit and needing to change position every hour to half hour during the day, and unable to do jobs with extensive math or reading required. Tr. 418-19. The VE testified that jobs within this hypothetical included electronics worker, small products assembler, and stitch machine operator. Tr. 419. Asked about sedentary jobs, the VE responded optical goods assembler was also within the hypothetical posed by the ALJ. Tr. 420.

Asked whether these jobs were consistent both with the Dictionary of Occupational Titles (DOT) and the ALJ's hypothetical, the VE answered yes. <u>Id.</u>

Upon questioning by Ms. Swilley's attorney, the VE testified that a person who was required to lie down 20-30 minutes at a time at least twice during work hours, on a daily basis, would not be able to do the jobs she named, and that an individual who was not able to use her hands repetitively during the course of a work day

OPINION AND ORDER Page 21

would also be precluded from the jobs mentioned. Id. The attorney
acknowledged, however, that an inability to use her hands was not
in Ms. Swilley's medical records, and that the question asked the
VE was based on Ms. Swilley's testimony about difficulty with the
keyboarding class. Tr. 421.

### ALJ's Decision

Because Ms. Swilley turned 18 years old during the pendency of
her claim, the ALJ divided her analysis into two sections, with
findings and conclusions for the period before Ms. Swilley turned
18 years old, and findings and conclusions for the period after Ms.
Swilley turned 18 years old.

The ALJ found that Ms. Swilley had not engaged in substantial
gainful activity at any time. She found that Ms. Swilley's severe
impairments were dextroscoliosis of the thoracic spine and a
learning disorder/organic brain injury, but that she did not have
medically determinable PTSD, dysthymia, or somatoform disorder,
because the latter three impairments were "only documented in a
report that was solicited by claimant's attorney from a
psychologist who had no records provided and relied only on
claimant's self report." Tr. 25. The ALJ found that Ms. Swilley's
severe impairments, whether standing alone or in combination, did
not meet or medically equal one of the listed impairments, and were
not functionally equal to the listings. Tr. 26-26.

### Standard

The court must affirm the Commissioner's decision if it is
based on proper legal standards and the findings are supported by

OPINION AND ORDER Page 22

substantial evidence in the record. <u>Meanel v. Apfel</u>, 172 F.3d 1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1998). However, the Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." <u>Andrews</u>, 53 F.3d at 1039-40.

The initial burden of proving disability rests on the claimant. <u>Meanel</u>, 172 F.3d at 1113; <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1432 (9th Cir. 1995).

An individual under the age of 18 is considered disabled if he or she has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 1614(a)(3)(C). An individual over the age of 18 is considered disabled if he or she demonstrates an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of 12 at least 12 months. 42 U.S.C. § 423(d)(1)(A).

OPINION AND ORDER Page 23

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a three-step sequential process for determining whether a person under 18 is disabled, 20 C.F.R. § 416.924(a), and a five-step sequential process for determining whether a person over 18 is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. The first three steps of the sequential process are the same regardless of whether the claimant is under or over 18 years of age.

In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two. At step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c), 416.924(a). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is

OPINION AND ORDER Page 24

denied. If the impairment is severe, the evaluation proceeds to the third step. Yuckert, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 140-41. For a claimant under 18, if the impairment does not meet or equal one of the listed impairments, the Commissioner determines whether an impairment or impairments functionally equals the listings. To determine whether an impairment functionally equals a listing, the Commissioner must assess the claimant's functioning in six domains: 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for himself or herself; and 6) health and physical well-being. In making this assessment, the Commissioner compares how appropriately, effectively and independently the claimant performs activities compared to the performance of other children of the same age who do not have impairments. In order to functionally equal the listings, the claimant's impairment or combination of impairments must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a (a)-(d).

A child has a "marked limitation" in a domain when her impairment "seriously interferes" with the ability to initiate, sustain or complete activities independently. 20 C.F.R. § 416.926a(e)(2). An "extreme" limitation in a domain is when the

OPINION AND ORDER Page 25

claimant's impairment "very seriously" interferes with her ability to initiate, sustain or complete activities independently. 20 C.F.R. § 416.926a(e)(3).

If a child's impairment meets, equals or functionally equals one of the listed impairments, and satisfies the duration requirement, he or she is considered disabled. 20 C.F.R. § 404.1520(d), 416.920(d), 416.924(a), (d)(1). If the impairment does not meet the duration requirement, or does not meet, equal or functionally equal one of the listed impairments, the claimant is not considered disabled.  20 C.F.R. § 416.924((d)(2).

For claimants over 18, if the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he or she is not considered disabled. Yuckert, 482 U.S. at 141-42. If the claimant shows an inability to perform past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other work in consideration of the claimant's age, education and past work experience. Yuckert, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

**Discussion**

Ms. Swilley asserts that the ALJ erred in finding her testimony not credible; in rejecting the opinions of Dr. Rawlins; in her RFC findings; and in presenting the VE with an inaccurate hypothetical, thereby invalidating the VE's testimony.

OPINION AND ORDER Page 26

1.   Rejection of Ms. Swilley's testimony

Ms. Swilley asserts that the ALJ did not provide clear and convincing reasons for rejecting her testimony about symptoms and limitations.

Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's subjective testimony must be "clear and convincing." Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. Id. The evidence upon which the ALJ relies must be substantial. Id. at 724. See also Holohan v. Massinari, 246 F.3d 1195, 1208 (9th Cir. 2001)(same). Examples of clear and convincing reasons include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistent statements, daily activities inconsistent with the alleged symptoms, a sparse work history, or testimony that is vague or less than candid. Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008); Lingenfelter v. Astrue, 504 F.3d 1028, 1040 (9th Cir. 2007). Credibility determinations bear on evaluations of medical evidence when an ALJ is presented with conflicting medical opinions or inconsistency between a claimant's subjective complaints and her diagnosed conditions. Webb v. Barnhart, 433 F.3d 683, 688 (9th Cir. 2005).

The ALJ's stated reasons for not finding Ms. Swilley's fully credible were 1) the inconsistency between Ms. Swilley's testimony that she had difficulty in her keyboarding class because her arms

OPINION AND ORDER Page 27

were numb, and her keyboarding teacher's report that she had good technique, with no weaknesses noted, and other teachers' consistent reports that her fine and gross motor skills were normal; 2) the inconsistency between Ms. Swilley's testimony that she was unable to sit, stand or walk for more than brief periods, and the absence of limitations imposed by physicians on sitting, standing and walking; 3) the inconsistency between Ms. Swilley's stated physical limitations and her doctors' repeated advice to increase her physical activity; and 4) the absence of any doctor's recommendation that Ms. Swilley should lie down during the day. The ALJ noted that by fall of 2005, Ms. Swilley was observed to be deconditioned, and concluded that Ms. Swilley's reported limitations "appear to be self-imposed and reflect deconditioning which would accompany such lack of activity." Tr. 37.

Ms. Swilley challenges the finding that her limitations are "self-imposed," relying on the recommendations of Dr. Bialik and Dr. Lee. But Dr. Bialik excused Ms. Swilley from PE for only two months in the spring of 2005. Dr. Lee provided Ms. Swilley with a note in March 2005, asking her school to allow "a period of rest at school when the pain comes on." Tr. 323. The record contains no other indication that medical practitioners advised or encouraged Ms. Swilley to engage in only minimal physical activity. On the other hand, there are several recommendations that she exercise. See, e.g., tr. 327 (Dr. d'Amato's advice on March 18, 2004, that Ms. Swilley swim, bicycle and jog, but not dive or ride horses yet); 326 (Dr. d'Amato's advice in September 2004 that she start

OPINION AND ORDER Page 28

upper body exercises with weights and continue with swimming program); tr. 338 (Dr. d'Amato's recommendation in May 2005 of daily flexion exercises and swimming).

I conclude that the ALJ's reasons for her adverse credibility findings are based on inconsistencies in Ms. Swilley's own statements, inconsistencies between Ms. Swilley's testimony and the medical record, and inconsistencies between Ms. Swilley's testimony and her school records, and are therefore clear and convincing.

2.   Rejection of Dr. Rawlins's opinions

The ALJ assigned little weight to the opinions of Dr. Rawlins, finding that with the exception of learning disorder/organic brain injury, his diagnoses were not supported by the record. The ALJ rejected Dr. Rawlins's diagnosis of Somatoform Disorder on the grounds that before her back surgery, Ms. Swilley was physically active, and after surgery, none of Ms. Swilley's doctors had found her level of pain to be significantly limiting. The ALJ rejected Dr. Rawlins's diagnosis of Dysthymia because a "person does not have marked social problems if she is simply withdrawn and uncomfortable," and because her teachers' observations were that she was very social, worked well in groups, socialized with classmates, and posed no behavioral problems. The ALJ noted that Dr. Rawlins's conclusion that Ms. Swilley was markedly limited in attention span and concentration were also contradicted by her educational records, which Dr. Rawlins had apparently not reviewed. The ALJ rejected the diagnosis of PTSD because it was based only on spotty recollections of her childhood.

OPINION AND ORDER Page 29

Ms. Swilley asserts that the ALJ erroneously rejected the findings of Dr. Rawlins, arguing that it was improper to reject the opinions of a clinical psychologist based on reports from teachers about Ms. Swilley's social skills, and that the ALJ erred in rejecting Dr. Rawlins's opinions because Dr. Rawlins provided a medical rationale for his conclusions and the ALJ may not substitute her own judgment for that of a medical professional. While these arguments, standing alone, have merit, the ALJ's rejection of Dr. Rawlins based on Ms. Swilley's lack of credibility is clear and convincing, and based on substantial evidence in the record.

Credibility determinations bear on evaluations of medical evidence when an ALJ is presented with conflicting medical opinions or inconsistency between a claimant's subjective complaints and her diagnosed conditions. Webb v. Barnhart, 433 F.3d 683, 688 (9th Cir. 2005). The ALJ's conclusion that Ms. Swilley was not entirely credible must therefore be taken into account when evaluating the extent to which Dr. Rawlins relied on Ms. Swilley's self reports for his opinions. Dr. Rawlins tested Ms. Swilley's memory and her academic achievement, but his diagnoses of Dysthymic Disorder, PTSD, and Somatoform Disorder are based entirely on Ms. Swilley's own statements about her insomnia, low energy level, low self-esteem, poor concentration, feelings of hopelessness, mild suicidal ideation, intermittent childhood memories, tendency to be withdrawn

OPINION AND ORDER Page 30

and uncomfortable in social situations,[3] her "subjectively convincing" descriptions of physical discomfort, and her own reported inability to sit or stand for extended periods. Tr. 376-77. Dr. Rawlins acknowledged that he had no medical information available to him. Tr. 376. Some of Ms. Swilley's statements to Dr. Rawlins are inconsistent with her teachers' observations that she is socially comfortable with her peers (sometimes too much so), educational records indicating that she had good attention span and ability to concentrate, and her physician's recommendations that she engage in regular exercise, including swimming, bicycling, and light weight training.

I conclude that the ALJ provided clear and convincing reasons, based on substantial evidence in the record, for her rejection of Dr. Rawlins's diagnoses of Dysthymic Disorder, PTSD, and Somatoform Disorder.

3.    Incorrect residual functional capacity findings

Ms. Swilley asserts that the ALJ erred by not incorporating into the hypothetical to the VE Ms. Swilley's impairment of learning disorder/organic brain injury. She argues that the mere limitation to jobs not requiring "extensive reading or math" do not reflect the findings of the agency's reviewing practitioners that Ms. Swilley had "some difficulty comprehend[ing] instructions and expressing her ideas," had a "lack of motivational organization," and showed "marked" limitations in moving about and manipulating

---

[3] None of these complaints appears elsewhere in the medical record.

OPINION AND ORDER Page 31

1  objects. Tr. 305, 311-12.

2      The ALJ's hypothetical to the VE must be based on medical
3  assumptions supported by substantial evidence in the record that
4  reflects each of the claimant's limitations. Osenbrock v. Apfel,
5  240 F.3d 1157, 1163 (9th Cir. 2001). An ALJ is free to accept or
6  reject restrictions in a hypothetical question that are not
7  supported by substantial evidence. Osenbrock, 240 F.3d at 1165. If
8  the hypothetical does not reflect all of disability claimant's
9  limitations, the VE's testimony has no evidentiary value to support
10 finding that claimant can perform jobs in national economy. See,
11 e.g., Matthews v. Shalala, 10 F.3d 678 (9th Cir. 1993).

12     None of the impairments that Ms. Swilley argues should have
13 been included in the hypothetical is supported by substantial
14 evidence in the record. The record does not suggest that Ms.
15 Swilley's lack of motivational organization is the result of a
16 physical or mental impairment; in fact, the assessment by Doctors
17 Kehrli and LeBray relied on by Ms. Swilley cites to the teacher
18 questionnaire of October 2003 for the finding of "lacks
19 motivational organization," tr. 311, and that questionnaire states
20 that the problem is the result of lack of motivation and
21 responsibility, rather than an impairment. Tr. 164, 169.

22     The assessment by Dr. Kehrli of "marked" limitations in moving
23 about and manipulating objects clarifies on its face that the
24 "marked" limitation is limited to the time of the assessment
25 (December 23, 2003), with the impairment being "less than marked"
26 by July 2004. Tr. 312.

27

28 OPINION AND ORDER Page 32

1    I find no error by the ALJ here.

2    4.    Improper reliance on testimony of VE

3    The VE testified, on the basis of the hypothetical, that Ms.

4    Swilley had the residual functional capacity to work as an

5    electronics worker, an assembler of small products, a line stitch

6    machine operator, and an optical goods assembler, all of which are

7    unskilled jobs. Tr. 419-20. Ms. Swilley argues that the definitions

8    of these jobs in the DOT would arguably require more extensive

9    reading and math skills for Ms. Swilley than are reflected in the

10   record. Ms. Swilley offers this example: the electronics worker

11   position, pursuant to the DOT, requires the mathematical ability

12   to: add and subtract two-digit numbers, multiply and divide 10s and

13   100 by 2, 3, 4, 5, perform the four basic arithmetic operations

14   with coins as part of a dollar, and perform operations with units

15   such as cup, pint, and quart, inch, foot and yard, and ounce and

16   pound. The language requirements are: passive vocabulary of 5,000

17   to 6,000 words, read at a rate of 190-215 words per minute, read

18   adventure stories and comic books, look up unfamiliar words in the

19   dictionary, and read instructions for assembling model cars and

20   airplanes. The DOT requirements for small parts assembler and

21   stitch machine operator have the same math requirements and require

22   the ability to recognize the meaning of 2,500 two or three syllable

23   words and read at a rate of 95-120 words per minute. Ms. Swilley

24   argues that there is no evidence that she can perform these

25   requirements, and therefore that the VE's testimony must be

26   rejected as inconsistent with the DOT.

27

28   OPINION AND ORDER Page 33

I disagree that the record contains no evidence that she can perform these requirements. According to a questionnaire completed by her mother on December 10, 2002, almost four years before the ALJ's decision, Ms. Swilley was able to read and understand sentences in comics and cartoons, spell words of more than four letters, add, subtract, multiply and divide numbers over 10, take public transportation by herself, and make correct change. Tr. 206, 208. The most recent educational testing of Ms. Swilley, by Dr. Rawlins, shows that she reads at fourth grade level and has arithmetic skills at fifth grade level. Tr. 376.

Moreover, the VE testified that all four of the jobs she named were unskilled. Social Security regulations provide that claimants with a marginal education (sixth grade or lower) or a limited education (seventh through eleventh grade) have the reasoning ability to perform unskilled work. 20 C.F.R. § 416.964. This evidence supports the ALJ's finding that Ms. Swilley had the ability to perform the unskilled jobs identified by the VE.

**Conclusion**

The Commissioner's decision, with respect to the periods before and after Ms. Swilley turned 18 years old, is affirmed.

IT IS SO ORDERED.

Dated this 1st day of <u>July</u>, 2009.

                              /s/ Dennis James Hubel

                         Dennis James Hubel
                         United States Magistrate Judge

OPINION AND ORDER Page 34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

OPINION AND ORDER Page 35